UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT LEE BERRY,
EUGENE BERRY, and
MARY BERRY,

        Plaintiffs,                              No. 20-cv-12959

v.                                                  Honorable Nancy G. Edmunds

CITY OF DETROIT,
KEITH MARSHALL, and
MARCELLUS BALL,

        Defendants.
_____/

**<u>OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [15]</u>**

This is a civil rights action brought by Plaintiffs Robert Lee Berry and his parents, Eugene Berry and Mary Berry, against Defendants City of Detroit,[1] Detroit Police Sergeant Marcellus Ball, and civilian crime analyst for the Detroit Police, Keith Marshall. The case stems from an erroneous identification of Plaintiff Robert Berry by the victim of a crime, the subsequent arrest and three-day detention of Robert Berry, and the execution of a search warrant at the residence of the three plaintiffs. The complaint contains four counts: (I) violation of civil rights pursuant to 42 U.S.C. § 1983 and § 1985; (II) malicious prosecution; (III) false arrest and false imprisonment; and (IV) gross negligence. (ECF No. 1-1.) On November 25, 2020, the Court remanded Plaintiffs' state law claims to the

---

[1] In their response to Defendants' motion, Plaintiffs agree to dismiss the City of Detroit as a defendant in this action. (ECF No. 19, PageID.305 ¶ 21.) Defendant City of Detroit is therefore dismissed.

1

Wayne County Circuit Court. (ECF No. 7.) Presently before the Court is Defendants' Motion for Summary Judgment. (ECF No. 15.) Plaintiffs filed a response to the motion. (ECF No. 19.) Defendants filed a reply (ECF No. 21) and an additional exhibit under seal (ECF No. 23). The Court finds its decision process would not be aided by oral argument and therefore declines to hold a hearing. *See* E.D. Mich. L.R. 7.1. For the reasons that follow, Defendants' motion is GRANTED.

**I.      Background**

   **A.      Plaintiffs**

Plaintiff Robert Lee Berry is the 53-year-old son of Plaintiffs Mary Berry and Eugene Berry. (ECF No. 19, PageID.323.) Robert Berry suffers from multiple health conditions and as a result of those conditions, he resides in the basement of his parents' house. (*Id.*, PageID.351-52.) From December 23, 2019, until January 1, 2020, Robert Berry was hospitalized as a result of his health concerns. (ECF No. 19-24, PageID.565.) Upon his discharge from the hospital on January 1, he was transferred by ambulance to a medical rehabilitation center where he stayed until January 25, 2020. (ECF Nos. 19-23, 19-25.)

   **B.      Underlying Criminal Incident**

On January 1, 2020, while Robert Berry was hospitalized, a criminal incident took place outside a coney island restaurant in Detroit. Two female friends were visiting the restaurant in the early morning hours just after midnight. (ECF Nos. 19, PageID.315; 19-2, PageID.347.) The inside of the restaurant was crowded and an altercation ensured between an unknown man and one of the women. (ECF Nos. 19-2; 19-12.) The man grabbed the woman by her hair and pulled her outside into the parking lot. (ECF No. 19-

2.) The woman was able to escape and run to her car, but the man followed and banged on her car window with a gun. (*Id.*, ECF No. 19-15, PageID.470.)

Security camera footage shows the victim driving out of the parking lot followed by a white car. (ECF No. 19-2.) The unknown man and another man are seen getting into a different vehicle. (*Id.*) Shortly after leaving, the female victim of the assault turned around and came back to the restaurant in search of her friend. (ECF No. 19-13.) She reported that as she was turning into the coney island,[2] she saw a white vehicle leaving the parking lot and glanced at the driver whom she saw was holding a gun. (ECF No. 19-13, PageID.466.) Moments later, she heard a gunshot and felt pain in her leg. (ECF Nos. 19-5; 19-13, 19-14.)

The victim fled the scene and drove to a nearby gas station where a bystander called for help. (ECF No. 19-13, PageID.467) Police and medics arrived and the victim was transported to the hospital where she was treated for a gunshot wound to her thigh. (*Id.*, ECF No. 19-12.) At the hospital, the victim described her attacker to police as a "younger black male" but gave no additional description. (ECF No. 19-5.) She had told police who arrived at the scene that she was not aware of who shot her. (ECF No. 19-4.)

### C.  Detroit Police Department Investigation

Defendant Sergeant Marcellus Ball, a 35-year veteran of the DPD, was assigned to oversee the Detroit Police Department's ("DPD") investigation of the incident. (ECF No.

---

[2] According to a responding police officer's report, the victim "kept changing the location of where she was shot. First, she said it was at the [coney island] . . . [t]hen she stated she was shot somewhere on Davison." (ECF No. 19-4, PageID.393.) Regardless, the parties do not dispute that the victim was shot at or within a few miles of the coney island after the victim left the restaurant.

3

19-8, PageID.415.) He took witness statements and reviewed security camera footage from inside and outside the coney island, although the clarity of the camera footage is in dispute. (*Id.*, PageID.420-21.) Defendant Ball also received and reviewed an anonymous tip called into DPD that alleged the shooting at the coney island was committed by a short, heavyset, and light-skinned man in his 40s with a street name of "Rabbit." (ECF No. 19-6, PageID.395.)

The tip was passed to Defendant Keith Marshall, a crime analyst, on January 2, 2020. (*Id.*) According to Defendant Marshall, the only information he had available to him was the nickname "Rabbit" and "some of the physical description." He processed this information by inputting "Rabbit" into a DPD database. This led Defendant Marshall to the profile of "Robbit" Berry, a misspelling of Robert Berry's name with his identifying information. (ECF No. 23, filed under seal.) DPD crime analysts do not, themselves, investigate the scenes of crimes or conduct interviews so Defendant Marshall passed the results of his database search on to Defendant Ball. (ECF No. 19-7, PageID.404, 406-07, 410.)

Defendant Ball reviewed Robert Berry's profile and determined more was needed before he could make an arrest. (ECF No. 19-8, PageID.424.) Using Robert Berry's photograph and the photographs of five other men of similar age and with similar characteristics, a DPD detective produced a photographic lineup to show witnesses. (*Id.* at 424, 435; ECF No. 19-34; ECF No. 15-1, PageID.163.) The lineup was first shown to the victim who identified Robert Berry as her attacker. (*Id.* at PageID.432.) She stated, "[i]t looks like him. Everything is the same. Facial hair and everything. He grabbed me by my hair and tried to pull me out [of] the coney island cussing at me. He had the gun."

4

(ECF No. 19-9, PageID.458.) A note on the victim's questionnaire indicated that the officer asked the victim, "are you positive that the man in picture #5 is the man who shot you or do you think it was him?" and the victim stated "that's him. I know that's him." (*Id.*)

Although the victim of the crime identified Plaintiff Robert Berry as her attacker, other witnesses indicated the attacker was not pictured in the photographic lineup. Nevertheless, Defendant Ball completed a request for an arrest warrant wherein he described the criminal incident and named Robert Berry as the suspect. (ECF No. 15-1.) He noted the victim identified Robert Berry from the photographic lineup, but that the victim's friend and restaurant owner did not identify the defendant "despite the fact that [the restaurant owner] stated . . . the defendant has been in his resturant (sic) in the past, and he thinks that he would be able to identify the defendant if he saw a picture of him . . ." (*Id.*) An assistant prosecuting attorney approved the charges against Plaintiff and a magistrate judge authorized the complaint and issued an arrest warrant. (*Id.*; ECF No. 15-3, PageID.171.)

The day the arrest warrant was issued, Defendant Ball completed and signed an affidavit for a search warrant in which he requested to search Plaintiff's residence for evidence related to the shooting. (ECF No. 19-31.) Once again Robert Berry was identified as the suspect. (*Id.*, PageID.591.) A second magistrate judge authorized the search warrant on February 20, 2020. (*Id.*)

### D. DPD Search and Robert Berry's Arrest

Once police were in possession of the signed search warrant, a raid team was sent to the residence to execute the search warrant and arrest Robert Berry. (ECF No. 19,

PageID.324.) Defendant Ball sat in a car down the street as the raid team entered. (ECF No. 19-8, PageID.453.)

All three Plaintiffs were present in the house as the raid team came through the front door, damaging it in the process. (ECF Nos. 19-3, PageID.362; 19-21, PageID.518-22, 539; 19-28.) Mary and Eugene Berry were startled by the officers coming through the front door—Mary Berry remembers yelling, "[s]omebody coming and kill us," to her son as he was making his way up from the basement. (ECF No. 19-21, PageID.512.) Out of fear of being shot, she begged her husband not to move. (*Id.* at PageID.513.) Raid officers handcuffed Mary and Eugene Berry and they remained handcuffed for approximately ten minutes. (ECF No. 19-22, PageID.551.)

Eventually, Defendant Ball entered the premises. Plaintiffs attempted to explain that Robert Berry had just gotten out of the hospital and they tried to show the officers Robert Berry's hospital discharge paperwork. (ECF No. 19-21, PageID.518-20; ECF No. 19-3, PageID.366.) Defendant Ball recalls seeing "some medical papers" at Plaintiffs' residence, although he is not sure if he read them. (ECF No. 15-6, PageID.213-14.) He states he was not aware at the time that Robert Berry was in the hospital on January 1. (*Id.*)

Robert Berry was taken to the Detroit Detention Center after his arrest and he remained there for approximately three days. (*Id.* PageID.518-20; ECF No. 19-3, PageID.369, 370-71.) On March 6, 2020, during a probable cause conference at the 36th district court, the victim indicated that Robert Berry was not her attacker. (ECF Nos. 19-20; 19-3, PageID.378-79.)  The charges against Mr. Berry were subsequently dismissed. (*Id.*)

6

## II. Legal Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate if the moving party shows the record does not reveal a "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014) (citing Fed. R. Civ. P. 56(a)).

The moving party has the initial burden of informing the court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has met its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The party opposing the motion must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. In considering a motion for summary judgment, the Court views "the evidence as well as all inferences drawn therefrom . . . in a light most favorable to the party opposing the motion." *Kochins v. Linden-Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir. 1986).

### III. Analysis

#### A. No Dispute of Material Facts

Defendants' Motion for Summary Judgment lays out the pertinent facts of this case, albeit not always with correct citations to the record before the Court. (*See* ECF No. 15, PageID.137-141.) Plaintiffs spend significant time in their response disputing minor details of these facts, and the adequacy of Defendants' factual sources. (*See* ECF No. 19, PageID.297-305.) For instance, Plaintiffs argue Defendants misstated the time of day the victim visited the coney island on the morning of the shooting, (*Id.* at PageID.297-98), and the depth of information contained in Defendants' Exhibit A, (*Id.* at PageID.298-302.) Despite these disagreements, the Court finds the record as a whole paints a clear picture of the material facts in this case and that these facts are not genuinely in dispute. *See Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001) (finding a fact to be "material" if its resolution affects the outcome of the lawsuit; *Anderson*, 477 U.S. at 248 (same); Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.")

#### B. Claims Against Defendant Ball

Plaintiffs' Complaint against Defendant Ball raises federal claims of unreasonable search and seizure, false arrest, and malicious prosecution pursuant to 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution.[3] (ECF No. 1-1.) Section 1983

---

[3] The first count of Plaintiffs' Complaint alleges without detail a violation of § 1985 in addition to a violation of § 1983, but Plaintiffs have either abandoned this claim or are willing to voluntarily dismiss it. (*See* ECF No. 1-1, PageID.17.) 42 U.S.C. § 1985 grants a civil cause of action for damages caused by various types of conspiracies aimed at injuring a person or denying him a Federal right or privilege. In their response to Defendants' Motion for Summary Judgement, Plaintiffs include no argument or evidence

8

aims to "deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). To prevail on a § 1983 claim, a plaintiff must generally demonstrate that: (1) he or she was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was caused by a person acting under color of state law. *Tahfs v. Proctor,* 316 F.3d 584, 590 (6th Cir. 2003). Defendants raise a defense of qualified immunity as to Defendant Ball. (ECF No. 15, PageID.145-46.)

"The doctrine of qualified immunity shields government officials performing discretionary functions from civil liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Baynes v. Cleland*, 799 F.3d 600, 609 (6th Cir. 2015) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). After a defending officer initially raises qualified immunity, the plaintiff bears the burden of showing that the officer is not entitled to qualified immunity. *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013).

There are two questions a court must consider when deciding whether a government official is entitled to qualified immunity: "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation? These prongs need not be considered sequentially." *Baynes*, 799 F.3d at 610 (quoting *Miller v. Sanilac County*, 606

---

to support a conspiracy claim. Moreover, Plaintiffs indicate they are not pursuing a separate claim for "unlawful conspiracy" in response to Defendants' briefing on the subject. (ECF No. 19, PageID.313 n. 1.) On this basis, the Court dismisses from this suit any claims brought under § 1985.

F.3d 240, 247 (6th Cir. 2010)). If either prong is not met, the government officer is entitled to qualified immunity." *Doe v. Miami Univ.*, 882 F.3d 579, 604 (6th Cir. 2018) (citing *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016)).

In this case, the Court determines that Plaintiffs' claims against Defendant Ball are precluded by qualified immunity because no constitutional violation occurred. The Fourth Amendment requires probable cause to secure a warrant, conduct a search of a residence, or make an arrest. *See* U.S. Const. amend. IV. ("[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause. . . .") If "the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched," probable cause exists and the resulting arrest or search is considered constitutional. *Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir. 1996) (quoting *United States v. Besase*, 521 F.2d 1306, 1307 (6th Cir. 1975)).

Defendants claim Robert Berry's arrest and the search of his residence were constitutional because probable cause existed to believe Robert Berry was the shooter and that evidence pertaining to the shooting would be found in Robert Berry's residence. (ECF No. 15, PageID.153.) Plaintiffs argue there was no probable cause for a multitude of reasons.

First, Plaintiffs claim the DPD investigation was flawed because the only nexus between Robert Berry and the attacker from the coney island was the anonymous tip that gave a street name of "Rabbit" and the DPD system's misspelling of Robert Berry's name as "Robbit.". (ECF No. 19, PageID.303.) Plaintiffs further claim the DPD's decision not to

investigate whether Robert Berry had an alias of "Rabbit" undercuts Defendants' claim that the warrants were supported by probable cause. (*Id.* at PageID.330.) Despite these arguments, Plaintiffs provide no evidence that would suggest the DPD investigation was inadequate given DPD policy and the facts known to Defendants during the relevant time period. Plaintiffs additionally overlook the victim's unequivocal identification of Robert Berry and the resulting issuance of judicially secured search and arrest warrants.

Defendants indicate that it was not unreasonable to include Robert Berry in a photographic lineup given the similarity of the names "Rabbit" and "Robbit." (*See generally*, ECF No. 19-7.) Further, there is no dispute the photographic lineup conformed with DPD policy as the photo array fillers were selected to closely resemble Robert Berry.[4] (ECF No. 19, PageID.341.) When presented with the photographic lineup, the victim of the crime identified Robert Berry as her attacker in no uncertain terms. (ECF No. 19-9, PageID.458.) "[T]hat's him. I know that's him." (*Id.*) This identification, on its own, establishes probable cause in this case.

"[A]n eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what [s]he had seen, or was in some fashion

---

[4] Plaintiffs argue the photo array was "unduly suggestive" because the other men photographed in the lineup had characteristics similar to Robert Berry "rather than being reasonably similar . . . [to] the witness's description of the offender." (ECF No. 19, PageID. 341-42.) This argument has no merit, however, as the evidence Plaintiffs present in support only shows that DPD followed the correct procedure when creating the photographic lineup. (*See, e.g.*, ECF No. 19-33, PageID.596 ("There should be similarity between the accused and other persons in the lineup with regard to height, body type, and coloration of hair and skin.")) At this point in the investigation, Robert Berry was the suspect. Thus, it was proper for the other lineup participants to resemble him.

mistaken regarding [her] recollection of the confrontation." *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999). Plaintiffs argue Robert Berry is not a "younger black male" as the victim first described her attacker to police, (ECF No. 19-5), and thus officers should have realized the victim's identification was mistaken. (ECF No. 19, PageID.341.) Such a description is subjective, however, and especially vague in the face of a confident identification during a lineup. The victim here had ample opportunity to see her attacker's face and note his features during the attack and before she was shot. (*See* ECF No. 19-13.) Accordingly, officers had no reason to believe she was lying or that her identification of Robert Berry was mistaken.

The victim's positive identification was enough to justify the arrest and search warrants even though officers were unable to secure additional, corroborating identifications from other witnesses. This is because "once probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused." *Ahlers*, 188 F.3d at 371 (citing *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988)). For the same reason, the existence of probable cause was not affected by DPD's decision not to investigate Robert Berry's whereabouts on the night in question prior to seeking a warrant. Because the victim's identification of Robert Berry provided probable cause, the warrant issued by the magistrate judge was valid.

It was therefore objectively reasonable for Defendant Ball to rely on the judicially-secured search and arrest warrants once they were issued. "Police officers are entitled to rely on a judicially secured warrant for immunity from a § 1983 action for illegal search and seizure unless the warrant is so lacking in indicia of probable cause, that official belief in the existence of probable cause is unreasonable." *Yancey v. Carroll Cnty.*, 876 F.2d 1238,

1243 (6th Cir. 1989); *see also Voyticky v. Vill. of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005) (noting that "a facially valid warrant is normally a complete defense to a federal constitutional claim for false arrest or false imprisonment made pursuant to § 1983.")

Even if the arrest warrant were invalid, it would not be unreasonable for a well-trained officer in Defendant Ball's position to believe the warrant was based on probable cause. *See Malley v. Briggs*, 475 U.S. 335, 345 (1986) (finding that officers cannot rely on a warrant if "a reasonably well-trained officer in [defendant's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.") Here, Defendant Ball included in his application for arrest warrant all the information available to him at the time, including that certain witnesses did not identify Robert Berry when shown the lineup during DPD's investigation. (ECF No. 15-1, PageID.163-64.) Specifically, Defendant Ball included that the victim's friend and restaurant owner did not identify the defendant "despite the fact that [the restaurant owner] stated in his statement that the defendant has been in his resturant (sic) in the past, and he thinks that he would be able to identify the defendant if he saw a picture of him . . ." (*Id.*) Given the completeness of the information included in the arrest warrant application, the approval of charges against Robert Berry by the district prosecuting attorney, and the issuance of an arrest warrant by a state magistrate judge, Defendant Ball was entitled to rely on the warrant.

Plaintiffs also seem to argue that a reasonable jury could determine that probable cause was lacking because the warrant application was incorrect in naming Robert Berry as the suspect. (ECF No. 19, PageID.331-32.) This argument lacks merit as it is well established that the "[t]he Constitution does not guarantee that only the guilty will be

13

arrested." *Baker v. McCollan*, 443 U.S. 137 (1979). Indeed, as the Sixth Circuit discussed in *Flemister v. City of Detroit*, the arrest and short detention of an innocent party based on a mistaken identity is insufficient to support a constitutional claim. 358 Fed. App'x 616, 620-21 (6th Cir. 2009).

Finally, Plaintiffs cite *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003) and claim they can overcome qualified immunity because Defendant Ball allegedly "turned a blind eye" toward exculpatory evidence. (ECF No. 19, PageID.336-37.) Plaintiffs tried to provide Robert Berry's hospital discharge paperwork to Defendant Ball during the search, but he did not read the papers and officers proceeded to arrest Robert Berry despite his alibi. (ECF Nos. 19-3, PageID.366; 19-8, PageID.444.) Despite Plaintiffs' arguments to the contrary, officers are not required to take a suspect's claimed alibi into account at the time of arrest thus there was no violation of Robert Berry's rights. *See Criss*, 867 F.2d at 263 ("A policeman . . . is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause.") Furthermore, Plaintiffs do not argue that Defendant Ball was aware of Robert Berry's alibi at the time he sought and secured the warrants. Thus, Plaintiffs cannot show Defendant Ball "stated a deliberate falsehood or showed reckless disregard for the truth" in his warrant application. *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003).[5]

---

[5] To the extent Defendant Ball left any other information out of the warrant applications, Plaintiffs provide no evidence, let alone the required "substantial" evidence, to support the argument that an omission was made due to a culpable mental state rather than a simple mistake. *See Vakilian*, 335 F.3d at 517. Ball included both inculpatory and exculpatory information in the arrest warrant application. (ECF No. 15-1.)

Because no constitutional violation occurred, qualified immunity precludes Plaintiffs' claims against Defendant Ball and those claims are dismissed.

### C.  Claims Against Defendant Marshall

The Court also dismisses Plaintiffs' claims against Defendant Marshall. Defendant Marshall is a civilian analyst who does office work for the DPD—he is not an officer or field investigator and he has no authority to arrest or detain individuals. (ECF No. 19-7, PageID.400, 407.) His sole connection to Plaintiffs is that he used DPD computer databases to investigate the Crime Stoppers' Tip and one of those databases led to Robert Berry's profile. Defendants filed under seal the DPD database printout that identifies Plaintiff Robert Berry as "Robbit" Berry. (ECF No. 23.) According to Defendant Marshall, the database produced this result when he searched the term "Rabbit," the name that was given to him from the Crime Stoppers' Tip. (ECF No. 19-7, PageID.404-05.) As was his duty, Defendant Marshall passed on the information he obtained from his computer investigation to the officer in charge of the investigation, Sergeant Ball. (*Id.* at PageID.406-07.) Plaintiffs produced no evidence to suggest Defendant Marshall was required, by DPD policy or otherwise, to conduct any additional investigation after his initial computer database searches. Because Plaintiffs have not produced evidence that could show causation by Defendant Marshall as to any of their claims, those claims fail. *See, e.g., Volticky v. Village of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005) ("[a] false arrest claim under federal law requires a plaintiff to prove that the *arresting officer* lacked probable cause to arrest the plaintiff") (emphasis added).

### D. Claims by Plaintiffs Mary Berry and Eugene Berry

Finally, the Court finds Plaintiffs Mary Berry and Eugene Berry have no cause of action against these Defendants for their temporary detainment as the search was executed. As a preliminary matter, it is clear Mary and Eugene Berry were "seized" by the officers who placed them in handcuffs. *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). Whether or not this brief detainment was unreasonable turns on whether members of the DPD raid team had a justifiable fear of personal safety. *See Ingram v. City of Columbus*, 185 F.3d 579 (6th 1991). As neither Defendant Ball nor Defendant Marshall were present on the scene when raid team officers entered the premises and handcuffed the Berrys, Plaintiffs Mary Berry and Eugene Berry's claims are dismissed for want of causation. (ECF No. 19-8, PageID.453.)

### IV. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 15) is hereby GRANTED.

SO ORDERED.

s/ Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: August 24, 2022

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 24, 2022, by electronic and/or ordinary mail.

        s/ Lisa Bartlett
        Case Manager